LOUIS J. MALONE et al., complainants,

*v.*

FRANCESCO ROMANO, appellant.

[Decided September 28th, 1923.]

On appeal of Francesco Romano.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

"The bill is filed by the five children of Raffaela Malone (later Raffaela Romano), deceased, and alleges an agreement between their mother and Francesco Romano (the mother's second husband), in 1909, whereby the mother was to invest about $1,000 in the purchase of a house and lots of land, and 'would live together with the said five children, accumulate and improve the property and in the event of the death of either of them one-half the property should forthwith belong to the children, and in the event of the death of both of them the property should belong to the said children outright, share and share alike.' The bill further alleges that the arrangement was carried out, the property purchased (though the deed was made to Raffaela Romano and Francesco Romano), and all lived together until the mother's death, in 1917, and the entry of the boys into military service—the daughter helping about the household and the boys contributing their earnings.

"After the mother's death the boys made allotments to the step-father. It is contended that they did this, relying on his statements that the property was theirs.

"The prayer of the bill is that Francesco (or Frank) Romano be declared to hold the property in trust for complainants, or that the moneys paid by them 'be decreed to be a first and paramount lien on said land and premises.'

"The theory of complainants' counsel is that the case is one where a resulting trust arises from the purchase of lands with the wife's money, the title being not taken in her name and there being no intended gift of the lands or a partial interest therein to the husband. *Irick* v. *Clement, 49 N. J. Eq. 590,* is relied upon as an analogous case.

"Let us examine the facts as established by the proofs or admissions.

"At the time of the purchase, Frank Romano and complainants' mother were husband and wife, and had been for nearly a year. The wife could not read or understand the English language—neither could the husband, apparently (for his testimony was through an interpreter).

"The bill alleges that the wife, about the time of her marriage, received about $1,000 from Italy. The husband's answer denies this. The bill alleges that the wife 'contributed over $1,000 of the money received from family sources, to the said property, under the agreement.' The answer 'admits the contribution,' * * * 'but denies the agreement set forth in paragraph 6.' No agreement is set forth in paragraph 6, though one is referred to. The pleadings are reprehensibly slipshod and careless on both sides, and it is difficult to determine what is intended to be admitted and what denied. I cannot say from the bill and answer that it is admitted that the wife paid $1,000 on the original purchase of the property, though it is certainly admitted that she at some time contributed $1,000 to the property. (Improvements and other buildings were later added.) The husband, in his testimony, denies that the wife gave anything toward buying the property or towards the property, but says she later got $500 from Italy, which she gave to him.

"Louis Malone, one of the complainants, testifies that his mother put $1,562.68 into the property; that with it she bought the property; that he was present at the purchase, and the money paid was brought by his mother and turned over by her to the vendor's agent. It does not appear how he knew this exact amount was paid by his mother (he was not cross-examined on the point), except inferentially from his statement that he was present at the purchase; he was only fifteen years old at the time (though he had been working for a year), nevertheless the testimony is positive and would probably control as against the thoroughly unsatisfactory testimony of the husband, were it not for the fact that the deed recites a total consideration of $2,900, of which $1,600 was by assumption of an existing mortgage—so that the balance paid could not have been more than $1,300. The husband says $900 of the $1,300 was paid by execution of a second mortgage, and he also says that he paid $600 in cash, whereas there would have been only $400 cash paid if a $900 second mortgage were given.

"Albert Malone, who was thirteen years old at the time, and just starting to work, says he also was present at the purchase, and that his mother paid the purchase-money; that it was about $1,500.

"Ziegler, the vendor's agent, was dead, and hence, his testimony could not be had. Petro Volpe, an Italian friend of the family, testified that he was present at Ziegler's office at the purchase; he confuses the pronouns 'he' and 'she,' but I think his testimony means that Mrs. Romano bought the property with money of her own, received from Italy; he doesn't remember seeing the money pass; doesn't know how much money Mrs. Romano paid; thinks the total purchase price was $2,500, but an advance payment had been made and a 'second mortgage' was given (though he says nothing about a 'first mortgage').

"George Barcia, a friend of the family, was present at the transaction as an interpreter. He saw the money on the table but doesn't remember how much it was, or who brought it or turned it over to Ziegler—though there is some slight corroboration, from the testimony as a whole, that the money paid was Mrs. Romano's.

"Among the exhibits offered in evidence were a bond and mortgage, of even date with the conveyance, given by Mr. and Mrs. Romano to the vendor, Cachelin, payable two years from date, but in the principal sum of $1,050, not $900. This was not paid, according to endorsements thereon, until at least four year afterwards, when a mortgage for $900 was given to the building and loan association. A second mortgage of $1,050 leaves only $250 actually paid in cash.

"This documentary evidence conclusively controverts on the one hand the husband's statement that he paid a cash consideration of $600 at the time of purchase, and also, on the other hand, the story of the two boys that their mother paid a cash consideration of some $1,500.

"By virtue of no reliance on the testimony of the husband, therefore (for from this and other parts of his testimony he proves himself unworthy of credence), but because of an equal inability to rely upon or place credence in the testimony of

the two boys, in this behalf, I am constrained to hold that complainants have failed to prove that the wife paid the cash consideration.

"And even if she had paid the $250 cash, that was not the whole consideration. There was the first mortgage of $1,600, which the husband as well as the wife obligated himself to pay, and there was the second bond and mortgage of $1,050 made by the husband as well as the wife.

"The theory of resulting trust fails.

"If the case be examined from the angle of the question of mistake, the result is the same. It is possible that Mrs. Romano believed that by the deed to herself and her husband each would take a half interest, and that her half would at her death go to her children (and that her husband either believed likewise, or fraudulently concealed his knowledge of the truth). There is some basis for such a conclusion from the testimony of the witnesses Volpe and Barcia (apparently disinterested), which testimony it is unnecessary to quote. The difficulty is that it is by no means conclusive. To warrant a decree that the deed be reformed from a deed to the grantees as husband and wife into a deed to them as tenants in common, requires proof that is practically conclusive. The evidence must be satisfactory, beyond a reasonable doubt. *Hupsch* v. *Resch, 45 N. J. Eq. 657; affirmed, 46 N. J. Eq. 609.* 'The proof must be clear and convincing, and upon testimony that is unexceptionable.' *Green* v. *Stone, 54 N. J. Eq. 387* (at *p. 399*).

"Moreover, there is another fatal obstacle in the way of relief by reformation, and that is that the grantors (or their representatives) in the deed are necessary parties in an action for such relief, and they are not in this case before the court. *Thiefes* v. *Mason, 36 Atl. Rep. 946.*

"There is some testimony to the effect that Romano represented or stated to the complainants that the title was, as to a one-half part, in the children, and it is contended that they paid moneys to him, relying upon such representation. One answer to this is that from the entire testimony of the complainants, the weight thereof is to the effect that what was

said by Romano was not a *statement* that the title was in such condition, but a *promise* that he would put it in such condition. And the promise, being merely verbal, cannot be enforced because of the statute of frauds.

"Another answer, equally cogent, is that I am satisfied from the testimony of the complainants themselves that their wages and allowances during minority were given to their mother. Albert, for instance, says 'my money that I have earned, I brought to him; I gave it to my mother and step-daddy.' And Louis, after repeatedly saying that he gave his wages to the step-father, later on in answer to a question of mine said, as to giving to the step-father all his wages from 1908 to 1914, 'Yes, to him and my mother; they were both together.' One of them said the mother was 'leading the family.' It is clear that they all lived together, the mother received the boys' wages, and the services of the daughter, and some, at least, of her husband's wages, and the children received their food and clothes and other requirements from the mother. The mother, under those circumstances, was entitled to the boys' wages and the daughter's services. *Osborn* v. *Allen, 26 N. J. Law 388.*

"The conclusion, then, from the facts as I find them to be, necessarily is that complainants are not entitled to any relief in the way of decree for conveyance or establishment of a trust or reformation of the original deed. Are they entitled to any relief whatever? If there were moneys paid by complainants to Romano, after attaining majority, in consideration of an oral promise by him to convey an interest in the lands, and that promise has been broken, then they are entitled to the return of such moneys. The pending suit having been properly brought in this court for relief obtainable here only, decree may be made herein for the return of such moneys, notwithstanding such relief could be had at law. *Cf. Bullock* v. *Adams, 20 N. J. Eq. 367;* also, *Gillen* v. *Hadley, 75 N. J. Eq. 602,* and sections 8, 9, Chancery act of 1915.

"I think the proofs do establish the fact of such payments under the circumstances mentioned, although I might hesi-

tate to reach such conclusion aside from the testimony of defendant, Romano, himself. The daughter paid no moneys, and her services ceased at. her marriage while still a minor. Edward is also still a minor. As to the others (without going into detail as to the evidence), Louis paid $150, Albert $630, and Anthony $480. These payments (which exclude all payments made during minority and the life of the mother) are not denied by Romano—indeed in large part they are specifically admitted in his testimony. His contention is that they were not paid pursuant to the oral contract alleged; that he made no such contract or promise; that the payments were made 'to keep the family,' and that the family consisted of four children, the mother and himself. The falsity of this is apparent—the mother was dead during the period covered by the payments in question; the daughter was married and living with her husband; Albert, Anthony and Louis were away in the army (until the last few months of the period), and the 'family' consisted solely of himself and Edward, who was working and turning over his wages to Romano, who also was earning good wages, as he says—$40 to $45 per week. The moneys then were paid. to keep the family. For what purpose were they paid? No other reason is suggested except complainants' claim that it was in pursuance of an oral contract for them to do so and that he would convey to them an interest in the property. There is other testimony to support this claim, and I find it to be the fact. The refusal to convey such interest or any interest is admitted by Romano. I will advise a decree for the payment by Romano to the three boys of these moneys, to the return of which they are both legally and equitably entitled, from which, however, certain deductions are to be made. As to Louis, he received back $30 from Romano. This leaves $120 due him. Albert received board and lodging from about May 1st, 1921, to September 27th, 1921—twenty-one weeks at $7 a week (which I fix as a fair price under all the evidence) equals $147, leaving $483 due him. Anthony received board and lodging from about June 11th to September 27th—fifteen week, or $105, leaving $375 due him.

"No costs."

*Mr. William J. Connor,* for the complainants.

*Mr. Robert Peacock,* for the defendant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Buchanan.

*For affirmance* — THE CHIEF-JUSTICE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, GARDNER, VAN BUSKIRK—12.

*For reversal*—None.